SHARP v. COE, Commissioner of Patents.
No. 7400.

United States Court of Appeals for the District of Columbia.

Decided Dec. 22, 1941.

STEPHENS, Associate Justice, dissenting in part.

Mr. Lester B. Clark, of Houston, Tex., with whom Messrs. Emmett L. Sheehan, of Washington, D. C., who entered an appearance, Jesse R. Stone and Ray L. Smith, both of Houston, Tex., appeared on the brief, for appellant.

Mr. Wm. Wallace Cochran, Solicitor, United States Patent Office, of Washington, D. C., for appellee.

Before STEPHENS, MILLER, and VINSON, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from an order of the District Court of the United States for the District of Columbia dismissing, after a hearing on the merits, a bill of complaint filed by the appellant Sharp under Rev. Stat. § 4915, as amended, 35 U.S.C.A. § 63. The appellant sought a decree authorizing the appellee, Commissioner of Patents, to issue a patent upon application No. 473,087 for an improved valve for pumps. Claims Nos. 23, 25, 26, 28 and 29 were rejected by the examiner and the Board of Appeals and by the Commissioner as lacking invention over specified prior art, to wit, Biedermann, No. 1,-530,924, Eastwood, No. 827,716, Hickerson, No. 1,785,259, MacClatchie, No. 1,-882,433, and Ginaca, No. 666,245. The trial court held that these claims were not patentable over the prior art, specifying particularly Eastwood, Biedermann and MacClatchie. On this appeal the Commissioner urges Biedermann, Eastwood, Hickerson and MacClatchie. Nothing is said of Ginaca. The rejected claims read as follows:

"23. In a high pressure pump, a pump body, a valve ring mounted therein, a valve including a stem, a valve gasket, and means to clamp said gasket upon said stem, a seat for said gasket on said ring, and means removably mounted (upon said valve ring) and formed of hard wear resisting material to receive the shock of the closing of the valve and hold said gasket from pounding against said seat.

"25. In a high pressure pump, a body, a valve ring mounted therein, an inner downwardly-tapered seat on said ring, a valve stem, clamping plates on said stem, a gasket between said plates and having

a downwardly tapered outer margin to engage said seat, said margin being tapered at a more obtuse angle than said seat so that said outer margin of said gasket will first engage said seat, a stop ring of hardened wear-resisting material on said valve ring and a stop member on said stem engaging said stop ring to take the shock of closing said valve.

"26. In a high pressure pump, a body, a valve ring mounted therein, an inner downwardly tapered seat on said ring, a valve stem, a valve body on said stem, a gasket mounted on said valve body and having a downwardly tapered outer margin to engage said seat, said margin being tapered at a more obtuse angle than said seat so that said outer margin of said gasket will first engage said seat, a stop ring of hardened wear-resisting material on said valve ring and a *stop member* on said stem engaging said stop ring to take the shock of closing said valve.

"28. A valve of the character described including a seat ring, a tapered seat thereon, a valve stem, a gasket, means supporting said gasket on said stem, said gasket being tapered differently than said seat and to a thin edge to contact with said seat at the outer margin thereof before the inner margin is fully seated, and *means to stop the closing of said valve before said gasket contacts fully with said seat except at its outer margin.* [Italics supplied.]

"29. A valve including a body, a packing gasket carried thereby and having a thin flexible edge, a seat on which said gasket is adapted to seal, and *means to stop the closing of said valve before said gasket contacts fully with said seat except along its outer margin."* [Italics supplied.]

The ultimate question in the case is whether the trial court erred in holding that these claims do not define invention. There is no dispute as to utility.

Seven claims of the application were allowed by the Commissioner. Five of these, to wit, Nos. 2, 21, 22, 24 and 27, contain a limitation, italicized below, substantially identical with that also italicized in rejected claims 28 and 29 above. Of the five allowed claims referred to, No. 27, reading as follows, is typical:

"27. In a high pressure pump, a body, a valve ring supported therein, an upper steeply tapered seat on said ring, a valve stem, valve plates thereon, a packing gasket between said plates and projecting above said seat, the lower margin of said gasket being tapered more obtusely than said seat, a removable stop member on said valve ring, and means formed to move with said valve stem and rigidly connected therewith to engage said stop member and *adapted to limit the closing movement of said valve before said gasket fully seals upon said ring and with the outer edge only in contact with said seat and take the shock of closing from said gasket before said valve is sealed."* [Italics supplied.]

The other four are printed in the margin.[1]

Incidental to determination of the correctness of the ruling of the trial court in

[1] "2. A valve including a seat ring, a seat thereon tapered downwardly and inwardly, a supporting guide member, a removable guide bushing in said guide, a valve stem slidable in said bushing, upper and lower plates on said stem, a nut to clamp said plates together, said nut being adapted to seat on said bushing, and a flexible packing gasket between said plates adapted to contact with said seat, *said gasket being tapered on its outer margin at a steeper angle than said seat, whereby it contacts with said seat on the outer margin first when said nut seats on said bushing."* [Italics supplied.]

"21. A pump valve including a valve ring adapted to be supported in a pump body, a downwardly and inwardly inclined seat at the upper end of said ring, a valve stem, upper and lower valve plates thereon formed to pass through said ring, a downwardly tapered packing gasket between said plates, said gasket being of greater diameter than said plates to project above said seat, *and removable wear-resisting stop means to stop the closing movement of said valve before said gasket seals upon said seat, whereby the fluid pressure above said gasket will act to then force the same into sealing engagement."* [Italics supplied.]

"22. A pump valve including a valve ring adapted to be supported in a pump body, a seat at the upper end of said ring, a valve stem, upper and lower valve plates thereon formed to pass through said ring, a packing gasket between said plates, said gasket being of greater diameter than said plates to project above said seat, but fitting entirely within the contour of said seat when closed, *and removable wear-resisting stop means supported upon said valve ring to stop the closing movement of said valve before said gasket is forced by said plates upon said seat, said stop means acting to take*

respect of the rejected claims is the question whether or not a court in passing upon the patentability of such claims may use allowed claims as a measure of patentability. On this question this case was reheard on October 13, 1941, having been consolidated for that purpose with No. 7374, Dyer v. Coe, —— App.D.C. ——, 125 F.2d 192, and No. 7533, Minnesota Mining & Manufacturing Co. v. Coe, —— App.D.C. ——, 125 F. 2d 198.

At the trial the Commissioner introduced in evidence the record in the Patent Office. Expert testimony was introduced for the appellant. From the record including the testimony, and from the briefs, the following appears: The type of valve which is the subject of the appellant's application is especially adapted for use in slush pumps, employed in connection with the drilling of deep oil wells, to force a prepared slush, or mud, down the drill pipe, out through the cutting bit, and then up the well bore on the outside of the pipe. This slush, which is of greater specific gravity than the earth being penetrated, acts to prevent the same from caving into the well bore. It also cools the bit and carries away the cuttings. On discharge from the bore the slush flows into a settling basin, and when the cuttings have settled out is again forced by the pump back into the drill pipe. For efficiency the valves must be sealed against leakage by the use of a flexible material such as rubber. To stop the valve a hard wear resisting material such as steel is used. Because of the high specific gravity of the slush and of the large quantity of slush required in wells of great depth, the valves in slush pumps are subjected to extreme pressure. As a result of this and of the abrasive action of the slush, the sealing part of the valves quickly wore out. On this account it was necessary to repair valves frequently. This had become one of the major expenses of drilling. The appellant's improvement solved the problem thus existing in the art.

The appellant's application discloses, in terms of a drawing set forth as Illustration I, a valve stem 13, 14, 15, 16' carrying two clamping plates 17 and 18 which themselves confine the flexible sealing member 19, a rubber packing gasket with a beveled

Illustration I

edge. The valve seat is the beveled edge of the support ring 3. This seating surface is beveled downward at an angle slightly different from the angle of inclination of the gasket itself and thus a small space 26 separates the lower edge of the gasket and the ring. Such valves are used as both discharge and suction valves. The one shown in Illustration I is a discharge valve. As the pump piston moves on the pressure stroke, the slush is forced out through the valve, and thus pushes against the slush previously pumped. After the piston reaches the end of this stroke and reverses direction, a suction occurs which causes the slush outside the valve to press against and close the same sharply. In closing, the valve is stopped by the contact of the nut 16 upon the shoulder 10 of the removably mounted metal wear resisting bushing 8. The arrangement of the parts in the appellant's valve is such that this occurs at the instant the outer edge of the beveled rubber gasket contacts the seat and therefore before this flexible sealing portion of the valve is completely seated. Since the shock of impact

*the wear of closing of the valve and to prevent pounding of said gasket on said seat.*" [Italics supplied.]

"24. In a high pressure pump, a body, a valve ring mounted therein, an inner downwardly tapered seat on said ring, a valve stem, clamping plates on said stem, a gasket between said plates and having a downwardly tapered outer margin to engage entirely within said seat, *said margin being tapered at a more obtuse angle than said seat so that said outer margin of said gasket will first engage said seat, and means on said valve ring to stop said valve with the outer edge only of said gasket engaging said seat.*" [Italics supplied.]

is thus borne by the wear resisting metal, the flexible material performs only the sealing function and thus escapes undue wear. The complete seal is effected after the stopping of the valve through the metal contact has taken place, the pressure of the slush against the gasket forcing the latter against the seat.

The Biedermann patent, on which the Commissioner puts its principal reliance, discloses a pump valve with a rubber member 5 which closes against an inclined seat 3. See Illustration II. There is a metal

Illustration II

to metal contact between the nut 9 and the abutment 13 which accomplishes stopping.

The Eastwood patent shows a flushing tank valve in which the seating surfaces of the valve 21 and seat 16 are beveled in such manner that the outer tapered edge of the valve first contacts with the seat. See Illustration III.

Illustration III

The MacClatchie patent discloses a pump valve in which the functions of sealing and seating are both performed at the same place, to wit, the place of contact of the metal surface 6 and the surface of the stop member 12, 13, 14, also metal. See Illustration IV. The stop

Illustration IV

member 12, 13, 14 is integrated and removable. Underneath it is a ring 9 made of yieldable packing material.

The Hickerson patent shows a metal valve body 39, a flexible gasket 43 carried thereby, seating and sealing surfaces 27, also of metal, and means 25 to stop the closing of the valve. See Illustration V.

Illustration V

In Hickerson, if, on account of the introduction of grit or other foreign material, the metal to metal stop does not accomplish a complete seal, the edge of the gasket will bend over through suction and pressure into sealing engagement, at point 29.

In respect of the question whether the allowed claims may be used as a measure of the patentability of the rejected claims: We are in agreement that the action of the Commissioner on allowed claims is not to be taken as a conclusive measure of the patentability of rejected claims. Patentability of the latter must

be determined ultimately by comparison with the prior art. In re Zalkind, Cust. & Pat. App. 1941, 118 F.2d 356; In re Farrand, Cust. & Pat. App. 1931, 49 F.2d 1035, 1038. And see In re Eitzen, Cust. & Pat. App. 1936, 86 F.2d 759, 760. But we are also agreed that, in connection with such other items of evidence as may be relevant, the action of the Commissioner on allowed claims can be taken into consideration in determining the patentability of rejected claims. Minnesota Mining & Manufacturing Co. v. Coe, D.C.U.S.Dist. Col.1939, 28 F.Supp. 80, 82. And see Cothran v. Coe, D.C.U.S.Dist.Col.1941, 38 F.Supp. 984, 989; Raytheon Mfg. Co. of Newton, Mass. v. Coe, 1938, 68 App.D.C. 255, 257, 96 F.2d 527, 529; In re Davis, Cust. & Pat. App., 77 F.2d 640, 643. Cf. also Poulsen v. Coe, 1941, 73 App.D.C. 324, 119 F.2d 188, 199; Fessenden v. Coe, 1938, 69 App.D.C. 193, 199, 99 F.2d 426, 432; In re Engelhardt, Cust. & Pat. App. 1930, 40 F.2d 760, 762. Contra: In re Borden, Cust. & Pat. App. 1934, 68 F.2d 983, 984. And we are agreed that what persuasive value should be given to the action of the Commissioner in respect of allowed claims is a matter which must be determined in each case on its own facts.

■ In the instant case on the merits Justices Miller and Vinson are of the view that, giving consideration to all of the evidence relevant to the question of invention, including the action of the Commissioner on the allowed claims, the trial court did not err in rejecting claims 23, 25 and 26 as not patentable over the prior art. They think that these claims were clearly anticipated by Biedermann (Illustration II), MacClatchie (Illustration IV) and Eastwood (Illustration III). Justices Miller and Vinson are further of the view that, giving consideration to all of the evidence relevant to the question of invention, including the action of the Commissioner on the allowed claims, the trial court did not err in rejecting claims 28 and 29 as not patentable over the prior art. In respect of claims 28 and 29 Justices Miller and Vinson state their views as follows: The question of patentability was answered in the negative by the Ex-

aminer and the Board of Appeals in the Patent Office. The applicant comes into the District Court under Rev.Stat. § 4915, 35 U.S.C.A. § 63, for an independent hearing. He introduced, as he is permitted to do under the statute, evidence additional to that offered in the Patent Office. If the rejected claims are held to be patentable the Patent Office is told to issue a patent. Are these claims patentable? That was the question in the District Court. It answered in the negative. The question here then "is not whether in our opinion there was invention, but whether the finding that there was none is consistent with the evidence, or, what is the same thing, is 'supported by the evidence.' "[2] This court through the years has repeatedly held that in cases in which the Patent Office and the District Court agree as to claims being unpatentable, we will not reverse unless *clear error* is shown. We adhere to that well settled position, and, in so doing, we do not in any way abdicate our appellate function. It is the opinion of the majority that the record before us does not show clear error, or error at all, in respect of claims 28 and 29.

When claims 28 and 29 leave the high pressure field and enter the low pressure field, they are immediately confronted with existing inventions and disclosures in the entire valve structure field. We do not possess the doubt expressed by our brother Stephens that these claims are in the high pressure field.[3]

In the low pressure valve structure field Eastwood (Illustration III) clearly anticipates the beveled or inclined surface of the valve seat in such manner so that the outer tapered edge of the valve gasket first contacts with the seat. The Board of Appeals in the Patent Office was of the opinion that claims 28 and 29 read directly upon the patent of Eastwood, except for the stop feature. Here is where Biedermann (Illustration II), and Hickerson (Illustration V) enter the picture. They anticipate the stop. As a matter of fact, it is common knowledge in the valve structure field generally that the stopping of the valve is an ordinary, yet important and necessary function.

2 Minnesota Mining & Mfg. Co. v. Coe, 73 App.D.C. 146, 118 F.2d 593, 594; Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449.

3 The Board of Appeals of the Patent Office found that claims 28 and 29 "are not limited to a high pressure pump valve; instead they are directed to valve structure, broadly." (R. 78)

The District Court in its conclusions of law found:

"2. It was not invention to taper the outer margin of the valve member of the Biedermann patent downwardly at an angle more obtuse than the angle of inclination of the seat member in view of the teaching of the Eastwood patent."
and

"3. It was not invention to provide means in the structure shown in the Eastwood patent to stop the closing of the valve before the gasket fully contacts with the seat, except at its outer margin."

We conclude that no reason is shown whatever for extending the Sharp apparatus to the low pressure field, or for allowing any claims which are broad enough to apply to the low pressure field. If the Patent Office erred in allowing a claim or claims which did have such application we can see no reason therein for upsetting the decision of the District Court as to claims 28 and 29, or either of them. Neither the Examiner nor the Board of Appeals in the Patent Office, nor the District Judge, discussed the allowed claims. We are of opinion that the District Court did not err in its action.

My own views in respect of the ruling of the trial court on the five claims in question are as follows: That aspect of the construction and adjustment of parts in the appellant's valve as a result of which, as above explained, the valve is stopped on the suction stroke by the contact of the metal parts at the instant the outer edge of the gasket contacts the seat and before complete seating, with the result of avoiding undue wear upon the gasket, is not shown in any of the references. According to the undisputed testimony in the trial court it is this advance over the prior art which proved useful and which resulted in commercial success. It is this aspect of the device which is described in the italicized portion of allowed claim 27 printed in the text above, and in each of allowed claims 2, 21, 22 and 24 printed in the margin above.[4] The trial court in conclusion of law 3 held that it was not invention to provide this means of avoiding undue wear upon the gasket.[5] I think that in this respect the trial court was clearly wrong. In my view this aspect of the appellant's valve is an inventive modification of or step beyond the prior art. If modification of the prior art, even though not great, nevertheless, as the last step taken accomplishes a new and useful result, and solves a problem which has beset the art and achieves commercial success, this, under substantial authority, is strong evidence of invention. Eibel Process Co. v. Paper Co., 1923, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Minerals Separation, Ltd. v. Hyde, 1916, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286. Indeed, the brief of the Commissioner on this appeal recognizes this particular aspect of the appellant's device as critical on the question of invention by justifying the rejection by the trial court and the Commissioner of claims 23, 25, 26, 28 and 29 upon the ground that the valve as described therein did not possess this differentiation.[6]

---

[4] This aspect of the appellant's device is not described in allowed claims 3 and 4. Why they were granted does not appear. These claims read as follows:

"3. A valve including a seat ring, a seat thereon tapered downwardly and inwardly, a supporting guide member, a removable guide bushing in said guide, a valve stem slidable in said bushing, upper and lower plates on said stem, a nut to clamp said plates together adapted to seat on said bushing, shock absorbing means on said support for said bushing, and a flexible packing gasket between said plates adapted to contact with said seat.

"4. A valve including a seat ring, a seat thereon tapered downwardly and inwardly, a supporting guide on said ring, a removable guide bushing in said guide, an outwardly sloping upper end on said bushing, a valve stem slidable in said bushing, upper and lower plates on said stem, a nut to clamp said plates together adapted to seat on said bushing, shock absorbing means on said support for said bushing, and a flexible packing gasket between said plates adapted to contact with said seat."

[5] Conclusion of law 3 reads as follows: "It was not invention to provide means in the structure shown in the Eastwood patent to stop the closing of the valve before the gasket fully contacts with the seat, except at its outer margin."

[6] The Commissioner's brief states: "Upon comparing the two sets of claims it will be found that *each of the rejected claims* lacks one or more limitations which are recited in the allowed claims. For example, rejected claim 23 omits limitation (g) of allowed claim 21, limita-

I think claims 23, 25 and 26 were properly held not patentable over the prior art because, as an examination of these claims will demonstrate, they do not describe this particular advance and therefore, particularizing: Since claim 23 lacks this critical differentiation it distinguishes from Biedermann (*Illustration II*) only in reciting that the abutment member 8 is formed of hard wear resisting material and is removably mounted. I agree with the view expressed in the Commissioner's brief that the member 13 of Biedermann was probably sufficiently wear resisting to perform its intended function of stopping the valve, and that no patentable advance is involved in the removable feature. The MacClatchie device (*Illustration IV*) discloses a removable stop member 12, 13 and 14 and describes it as being made of suitable wear resisting material. Claims 25 and 26, absent the critical advance, add nothing to Biedermann except the element of the beveled edge of the rubber gasket. This feature is suggested by Eastwood (*Illustration III*) in which the valve member 21 is tapered to a thin edge. I think that in view of this suggestion in the Eastwood patent, it did not require invention to modify Biedermann so as to reach the structure described in claims 25 and 26.

In respect of claims 28 and 29: Examination of the italicized portion of these two claims will demonstrate that they do contain the critical limitation which I have described. If this is, as I think, an inventive advance over the prior art and therefore properly made patentable the five allowed claims in which it is defined, then it is a valid criterion of invention for all of the claims in which it is described. It thus follows, in my view, that claims 28 and 29 must clearly have been held allowable, unless rejected for mere multiplicity. But this was not the basis of their rejection. The Commissioner, however, in his brief on appeal attacks these two claims by asserting that they are drawn broadly enough to cover valves in general rather than merely valves for pumps, and contends that they are therefore met by Eastwood (Illustration III), except for the means in the appellant's device to stop the valve by contact of the metal parts at the instant the outer edge of the gasket contacts the seat and before complete seating.[7] It is to be noted in passing that this assertion as to the breadth of the claims is not correct in respect of claim 28 for it reads "a valve of the character described," i.e., described in the previous claim, to wit, claim 27, which itself defines a valve "in a high pressure pump."[8] But assuming that both claims 28 and 29 are drawn broadly enough to cover valves in general rather than merely valves for pumps, I cannot agree with the contention that they are met by Eastwood except for the means in the appellant's device to stop the valve at the moment the outer edge of the gasket contacts the seat. In this exception lies the very differentiation over the prior art which is in my view inventive over all of the references relied upon, including Eastwood, which, it is to be noted, is much less close to the appellant's structure than Biedermann (Illustration II). The mere fact that claims 28 and 29 relate to a broader art than the other rejected claims cannot, I think, defeat them, unless in the broader art there is anticipation, or unless in the broader art they lack

tions (f) and (g) of allowed claim 22, limitations (g) and (i) of allowed claim 24, and limitation (i) of allowed claim 27." (Italics supplied. The lettered references are to lettered paragraphs into which the rejected claims and the allowed claims were divided in the appellant's brief for the purpose of comparison.) An examination of these limitations shows that within them is contained the advance described in the italicized portion of allowed claims 2, 21, 22, 24 and 27, which claims the Commissioner held inventive over the prior art. These five claims were not, so far as the record shows, allowed because the Commissioner considered them to possess any other differentiation over the prior art.

I demonstrate in the text below that the statement in the Commissioner's brief that "each of the rejected claims" lacks the modification of the prior art under present discussion is incorrect in respect of claims 28 and 29.

[7] The examiner thought that Eastwood did have a means other than the flexible gasket 21 for stopping the valve. But the Board of Appeals recognized that this was not correct, saying: "Claims 28 and 29 are not limited to a high pressure pump valve; instead, they are directed to valve structure, broadly. These claims are deemed to read directly upon the patent to Eastwood *except for the stop feature.*" (Italics supplied.)

[8] As do also claims 26, 25, 24 and 23.

utility—and it is not asserted that they lack utility. "The use for which a device is intended is not the measure of a patentee's right. He may ordinarily claim every use to which the product can be applied, irrespective of whether he had it in mind at the time he made the invention." Deitel v. La Minuette Trading Co., 2 Cir., 1930, 37 F.2d 41, 42. Against claim 29 the Commissioner's brief also urges Hickerson (Illustration V). But, again, Hickerson lacks the particular limitation which is, as I see it, determinative of invention. Hickerson can therefore no more anticipate claim 29 than could Eastwood and Biedermann. This is made evident by an examination of the drawings of Hickerson, Biedermann and the appellant above set forth. In Biedermann the gasket fully contacts the seat before the metal to metal stop occurs; in Hickerson complete metal to metal contact is made before the gasket contacts at all. I therefore think that there was clear error in the ruling of the trial court that claims 28 and 29 are not patentable.

In summary: Justice Miller, Justice Vinson and I all agree that claims 23, 25 and 26 were properly held not patentable; Justices Miller and Vinson conclude also that claims 28 and 29 were properly held not patentable; in my view there was error in holding claims 28 and 29 not patentable.

In accordance with the foregoing the judgment of the trial court is

Affirmed.